**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CARRINGTON STURGIS,<br><br>Plaintiff,<br><br>v.<br><br>HOLLY HOOVER, *et al.*<br><br>Defendants. | Civil Action No.: SAG-25-841 |

**MEMORANDUM OPINION**

Defendants Holly Hoover, Karen Coleman, and Centurion of Maryland, LLC, have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment in response to the civil rights complaint filed by Plaintiff Carrington Sturgis, a prisoner confined to North Branch Correctional Institution ("NBCI"). ECF No. 28. Sturgis has not opposed the motion; rather his filings have focused on defense counsel's requests for extensions of time, motions to strike appearance, and their efforts to obtain medical records needed to defend the suit against them. ECF Nos. 30, 31, 32, 33 38. No hearing is necessary. *See* D. Md. Local R. 105.6 (2025). For the reasons set forth below, Sturgis's motion for extension of time, ECF No. 32, will be granted *nunc pro tunc.*[1] Defendants' motion, ECF No. 28, construed as a motion to dismiss as to Centurion and for summary judgment as to the individual defendants, is granted, subject to reconsideration should Sturgis file a substantive opposition within 28 days of the date of this Memorandum Opinion and the accompanying Order.

---

[1] Sturgis's motion for extension of time sought until April 20, 2026 to file his substantive response to Defendants' dispositive motion. ECF No. 32. That date has long passed and Sturgis has never filed a response. This Court is granting his motion *nunc pro tunc,* but because no opposition was filed it adjudicates Defendants' dispositive motion as unopposed. Given Sturgis's self-represented status, however, this Court recognizes that the lack of formal ruling on the motion for extension may have altered his filing decisions. Accordingly, while this Court is granting the dispositive motion, it will build in a period for reconsideration should Sturgis file a belated opposition within the prescribed window.

## BACKGROUND

### A. Complaint Allegations

In a supplemental complaint,[2] Sturgis asserts that on the morning of October 22, 2023, he awakened to find he could not move his legs and claims that since being at NBCI his symptoms have worsened. ECF No. 5 at 4. He states that he is not aware of what is causing his symptoms and explains that this is the reason he has repeatedly submitted sick call slips in an effort to obtain a diagnosis. *Id*. He states his condition causes debilitating pain. *Id*.

On November 15, 2023, Sturgis claims that Dr. Dustin Johnson recommended an x-ray of his right hip and that if Sturgis remained in persistent pain, a follow-up radiographic evaluation such as an MRI should be performed in 10 to 14 days. ECF No. 5 at 7. Sturgis states that he does not recall being given a follow-up "radiographic evaluation in 10-14 days." *Id*. Sturgis states, "[a]n MRI for the location of pain was never given, I received a spinal MRI instead." *Id*. (emphasis in original). He further claims that he was never spoken to about a "three phase bone scan by any employee at NextGen Health (Centurion) including Nurse Holly Hoover or RN Karen Coleman." *Id*. at 7-8.

Although Sturgis made medical staff aware of the constant pain in his legs, he states he was not given crutches until September 26, 2024. ECF No. 5 at 6. The crutches were taken away from him on March 13, 2025. *Id*. He states he was also given a wheelchair on December 17, 2024, but Holly Hoover took it away from him on January 29, 2025. *Id*. He claims that Hoover told him that the pain was in his mind and that she wanted him to walk. *Id*.

Sturgis claims that on October 28, 2024, Hoover postponed sick calls indefinitely but three days later "redid sick calls" in housing unit 3. ECF No. 5 at 7. He states that she never called him

---

[2] The supplemental complaint, ECF No. 5, will serve as the operative complaint as it in the nature of an amended complaint.

to be seen and even refused to see him. *Id*. He states that when he told staff on duty at that time about his ongoing pain and that he really needed to see Hoover, he was nevertheless denied that opportunity. *Id*. He claims this action subjected him to deliberate indifference to his serious medical need, especially by Hoover. *Id*.

Sturgis claims that Hoover wrote that the x-ray of his left and right hip were unremarkable and that physical therapy would not do well for him, but it was nevertheless ordered for him on January 9, 2025. ECF No. 5 at 8. He states that he has missed two appointments; the first because he could not walk to the appointment and the second because he had an appointment at UPMC.[3] *Id*. He complains that he has never been given an MRI of his legs; only an MRI of his spine which was done on March 4, 2025. *Id*. The spinal MRI was done two years after it was recommended by Dr. Johnson. *Id*.

Sturgis states that on March 26, 2025, he requested to review his full medical record so he could "deliver vital details to the courts" but he was not permitted to see his records. ECF No. 5 at 5. When his initial request was unsuccessful, Sturgis filled out a "2012 form" which was filed directly with the Warden's office; in it, he asked for results from CAT scans, x-rays, MRIs as well as any and all information regarding his legs, but to no avail. *Id*.

**B. Defendants' Response**

Defendants state that Centurion was not the medical services provider for Maryland's Department of Public Safety and Correctional Services ("DPSCS") until August 1, 2024. ECF No. 28-2 at 2. Prior to that date, YesCare was the contracted medical care provider; YesCare is not a defendant in this case. They nevertheless provide the history of Sturgis's medical care as summarized below.

---

[3] The full name of the hospital, which does not appear anywhere in the record, is University of Pittsburgh Medical Center Western Maryland.

Sturgis was transferred to NBCI from Western Correctional Institution ("WCI") on August 31, 2023. ECF No. 28-3 at 387-423 (intake evaluation). On September 8, 2023, Sturgis submitted a sick call slip stating that bullets inside his leg were causing nerve damage and excruciating pain; he claimed he could not walk, only stumble. *Id*. at 367. On September 19, 2023, Sturgis refused to be seen for Chronic Care and sick call. *Id*. at 32. A note was sent to Sturgis from Dr. Getachew informing him of the importance of regular medical attention to maintaining his health and receiving his medical renewals; another appointment for Sturgis was rescheduled. *Id*. at 383.

On October 22, 2023, Sturgis was seen for leg pain which he claimed had started five to six months prior. ECF No. 28-3 at 376. He explained that he had been using capsaicin cream, compression stockings, and an ACE wrap while at WCI but since his transfer he had not had access to any of those items. *Id*. The assessment at this time was that Sturgis had an unsteady gait with difficulty walking. *Id*. at 377. Sturgis was provided with ten tablets of Tylenol and a "generous amount of muscle rub" with instructions on its proper use. *Id*. A referral for Sturgis to see a provider was also planned. *Id*.

When Sturgis was seen for his September 8, 2023, sick call slip on November 5, 2023, he reported that he had been shot several years prior and that bullet fragments remained in his left hamstring, left lower buttock, and left posterior thigh. ECF No. 28-3 at 367. Although Sturgis described his pain as debilitating and unrelenting, he also told the provider that he goes out for recreation and participates in sports such as baseball and running. *Id*. He also did not exhibit any telltale signs that he was in pain when he was walking to the medical room or getting on and off the exam table and he denied any interference with activities of daily living (ADL). *Id*. An x-ray and Tylenol were ordered for Sturgis. *Id*. at 369. On November 14, 2023, Sturgis underwent x-rays of both his left and right hips. ECF No. 28-3 at 34-37. The x-rays revealed a bullet fragment in the right hip but did not show any other abnormalities in either hip. *Id*.

On May 27, 2024, Sturgis submitted a sick call slip stating he felt something was wrong with his right hamstring as he had persistent pain that caused him to walk with a limp despite doing the stretching exercises that had been given to him. ECF No. 28-3 at 46. Sturgis was seen on May 30, 2024, for this complaint and he was instructed to continue doing stretching exercises and taking Tylenol. *Id*. at 318-19. He reported that he had felt much better for a while but began "to do Burpees again." *Id*. at 319. At that time Sturgis rated his pain at a 6 on a scale of 1 to 10. *Id*. He was told to discontinue burpees and to notify medical if his pain worsened or did not improve. *Id*. at 320.

On June 10, 2024, Sturgis returned stating that his right hamstring felt like he had pulled it and the pain was keeping him from walking, standing, and sleeping comfortably. ECF No. 28-3 at 313. At this time, Sturgis rated the pain at a ten. *Id*. at 314. His gait was described as steady, and Sturgis was requesting to be seen by a provider for the pain and claimed he woke up with this pain in 2023. *Id*. at 315. He denied any known injury and hypothesized that he had pulled or torn his hamstring. *Id*. He reported that muscle relaxers helped with the pain and said the pain was a "10 at all times." *Id*. Sturgis was referred to a provider. *Id*.

On June 12, 2024, Sturgis was seen by Dr. Ernest Uzicanin for his complaint of right hamstring pain. ECF No. 28-3 at 307. Dr. Uzicanin noted that the problem had started one year prior and his impression was that the pain was either caused by an injury or sciatica. *Id*. at 308. He ordered an x-ray of Sturgis's lumbar spine, ordered an ACE wrap, and Motrin 600 mg four times a day. *Id*.

On June 19, 2024, Sturgis was seen for right leg pain by Holly Hoover, CRNP. ECF No. 28-3 at 301-303. Hoover noted the injury as a basketball injury that occurred two years ago. *Id*. at 301. Sturgis reported that the pain is aggravated by "bending, climbing (and descending) stairs, movement, pushing, sitting, walking and standing." *Id*. He stated the pain was relieved with pain medications and rest. *Id*. Sturgis did not have any bruising, crepitus, difficulty falling asleep, joint

instability, locking, nocturnal awakening or pain, numbness, popping, swelling, or weakness. *Id*. She noted that Sturgis was reporting sharp pain radiating down his right leg to his right ankle and that his ankle felt irritated and tight. *Id*. He claimed that walking long distances was impossible. *Id*. Based on this information, Hoover assessed Sturgis with a sprained sacroiliac joint and prescribed prednisone, two 20 mg tablets four times per day for five days and she cancelled the x-ray that was ordered for Sturgis's lumbar spine. *Id*. at 303. He was told to submit a sick call for worsening symptoms or medical concerns. *Id*.

On July 2, 2024, Sturgis submitted a sick call complaining that his right hamstring was still causing him problems. He explained that he had severe pain throughout his right leg, knee, and tailbone with spasms and sharp, shooting pains. *Id*. at 49.

On July 12, 2024, Sturgis submitted another sick call slip stating that the pain had not improved after the course of prednisone and that he was supposed to have an x-ray of the area if the prednisone did not work. ECF No. 28-3 at 297. An x-ray of his lumbar spine was ordered. *Id*. at 298. Four days later, the x-rays were performed. *Id*. at 51. The results did not reveal any evidence of acute fracture or change in vertebral body heights, but a ballistic fragment was noted. *Id*. The radiologist made a recommendation for further clinical evaluation with a CT or MRI due to "limitations in the evaluation of spinal disease especially soft tissues, ligamentous and disc disease." *Id*.

On July 30, 2024, Sturgis submitted a sick call slip stating his left hamstring was "in excruciating pain" and the ibuprofen was not working. *Id*. at 53. He also asked to discuss the results of the x-ray. *Id*. On August 1, 2024, Sturgis was presented with a form to sign indicating that he was informed of the x-ray results but refused to sign it. *Id*. at 52. He also refused to be seen for a sick call slip he submitted regarding pain in his right hamstring. *Id*. at 49.

On August 16, 2024, Sturgis was seen by Holly Hoover for a chronic care visit. ECF No. 28-3 at 276. During this visit he reported sharp pain radiating down his right leg into his ankle. *Id*. He said that his ankle felt irritated and tight, making walking long distances "nearly impossible" due to the pain. *Id*. The injury is described as a sports injury occurring two years prior. *Id*. Hoover noted that "Patient statements appear incongruent with what he reports." *Id*. She noted that he could walk from his cell to the medical room "with a smooth steady gate" and that he was "able to get onto and off of the exam table without issue or assistance." *Id*. Hoover also observed that Sturgis still participated in sports such as basketball and running and that the x-rays of his left and right hips were unremarkable. *Id*. The treatment plan Hoover wrote in Sturgis's medical record was to avoid high impact exercises such as running and basketball. *Id*. at 278.

Sturgis submitted two more sick call slips on August 29, 2024, and September 19, 2024, complaining of pain in his right leg. ECF No. 28-3 at 56 and 58. On September 5, 2024, Sturgis was seen for his complaint of leg pain. *Id*. at 258. Chaslynne Morton, RN, noted that Sturgis had been seen multiple times for the same problem and that he had no visible signs of injury to his right thigh area. *Id*. She also noted that Sturgis was walking with a mild limp when he arrived in the medical unit and walked with a significant limp when he left. *Id*. Morton referred Sturgis to an on-site provider to be evaluated and treated; she educated him about "practicing RICE with the area." *Id*. She noted that Sturgis had been provided with an ACE wrap previously but that he was not wearing it. *Id*.

On September 26, 2024, Sturgis was seen by Hoover for his bilateral thigh pain. ECF No. 28-3 at 251. Hoover noted that all treatment therapies, rest, crutches, NSAIDS, ice, ACE bandage, light stretching, and time, had failed. *Id*. at 253. She also noted that Sturgis would not do well in physical therapy because he is non-weight bearing. *Id*. The plan she developed was for an MRI of the right hamstring, continuation of ibuprofen, crutches for 34 weeks, and an ACE bandage. *Id*.

The request for an MRI was submitted the same day as the visit. *Id*. at 246-47. The request was not approved, and an alternative treatment plan was offered on October 15, 2024. *Id*. at 249. Dr. Ikusika wrote that they were unable to determine the necessity for an MRI of Sturgis's thigh at that time. *Id*. He suggested lab testing "CPK, electrolytes" and "onsite venous and arterial duplex US." *Id*. He asked that the consult request be resubmitted "with additional information" regarding whether there was any recent trauma to the area; if there had been a neurovascular exam; whether there was any buttock or back pain; what the distal pulses were; and if the symptoms were consistent with claudication. *Id*. On October 15, 2024, Hoover ordered venous and arterial ultrasounds on both of Sturgis's legs. *Id*. at 231.

On November 12, 2024, Sturgis had ultrasounds on his lower extremity arteries and veins. ECF No. 28-3 at 67. The results of that test showed "normal flow, compressibility and augmentation throughout" with no "echogenic thrombus" identified. *Id*.

On November 25, 2024, Sturgis refused to go to medical for a follow up appointment regarding the ultrasound, explaining to Karen Coleman that "it is too hard to come to medical on his crutches." ECF No. 28-3 at 214. Coleman notes, however, that the officer who accompanied her to Sturgis's cell informed her that he had seen him walking in the housing unit without his crutches as recently as two weeks prior. *Id*. Sturgis refused to sign a release of responsibility ("ROR") form acknowledging that he had refused the appointment. *Id*.

On November 26, 2024, Sturgis submitted a sick call requesting a foot tub because he could not wash his feet properly in the shower due to his leg pain. ECF No. 28-3 at 70. He explained that it hurts to bend for long periods of time. *Id*. Sturgis was seen for this sick call slip on December 5, 2024. *Id*. at 207-209. Morton noted that Sturgis denied having any wounds, ulcers, callouses, or areas of concerns on his feet caused by not being able to wash his feet properly. *Id*. at 208. Sturgis also denied any itching, burning, or rashes. *Id*. Because no problems had arisen due to the claim

that he could not properly wash his feet, there was "no medical indication for … a foot basin." *Id*. Morton told Sturgis that foot basins were prohibited to be in inmates' personal possession and told him he should wash his feet in his cell while sitting down using warm soapy water and washcloth. *Id*. She noted that Sturgis was agreeable with the plan and understood what she was telling him. *Id*.

On December 17, 2024, Hoover saw Sturgis for "sharp pain radiating down the right leg into the right ankle with intense pain at the biceps femoris." ECF No. 28-3 at 199. Sturgis began demanding to be sent to the hospital for an immediate MRI and became so hostile that the visit had to be stopped. *Id*. Hoover noted that a consult for an MRI had been requested but was returned with an alternative treatment plan. *Id*. She also noted that the x-rays and the ultrasound were unremarkable. *Id*. She requested an MRI again and put in an order for Toradol. *Id*. Sturgis was given a 30mg/1ml IM injection of Toradol for his pain the same day. *Id*. at 197.

On December 22, 2024, Hoover requested approval for a physical therapy evaluation for Sturgis. ECF No. 28-3 at 188. The request was approved by Sandra Boettinger, UMRN, through March 22, 2025. *Id*. at 189. On December 27, 2024, after Sturgis submitted a sick call slip stating that his legs were painful, he had no pain medication, and the Voltaren he was prescribed was not helping, ibuprofen was ordered for him. *Id*. at 71. The request for an MRI was approved on January 29, 2025. *Id*. at 709.

In a record dated February 10, 2025, Sturgis is described as arriving in the WCI infirmary in a wheelchair where he reported that he felt good. ECF No. 28-3 at 696. Sturgis underwent a CT scan that day on his right leg at UPMC Western Maryland which revealed no fractures, dislocations, reactive or destructive bony processes, or degenerative changes. *Id*. at 78. It was again noted that there was a foreign body in the hamstring region. *Id*.

On February 18, 2025, Sturgis attended physical therapy and was able to complete all exercises without pain or discomfort. ECF No. 28-3 at 691. At that time, Sturgis rated his pain at a 6 of 10. *Id*. at 690.

On February 23, 2025, Sturgis was seen to discuss his CT scan results, which were unremarkable. ECF No. 28-3 at 681. At this appointment, Sturgis asked for something stronger to address his pain; he was prescribed Mobic 7.5mg twice a day and advised him to stop taking ibuprofen. *Id*. at 682.

On February 25, 2025, Sturgis refused to attend physical therapy because he could not get out of bed due to severe pain in his legs. ECF No. 28-3 at 80. Two days later, Sturgis attended physical therapy and reported the pain to be 8 out of 10 in both legs. *Id*. at 670-71. The physical therapist noted that Sturgis completed all of the exercises provided without pain or discomfort displayed and that he "does display over dramatization of condition." *Id*. at 671.

Sturgis had an MRI of his lumbar and sacral spine at UMPC Western Maryland on March 4, 2025. ECF No. 28-3 at 82. The MRI did not show any significant abnormalities. *Id*.

On March 10, 2025, Sturgis shared with a behavioral health provider that he believed he has multiple sclerosis ("MS"). ECF No. 28-3 at 648. On March 13, 2025, Sturgis was informed of his MRI results and became upset when he was told they were unremarkable. *Id*. at 641. Sturgis told Hoover that he was in pain, despite what the MRI showed. *Id*. Hoover referred Sturgis to psychology. *Id*. at 643.

On April 15, 2025, Sturgis submitted a sick call slip stating that there were bullet fragments inside of him and he wanted to have blood tests to determine if the bullets contained lead and are the source of any problems he is experiencing. ECF No. 28-3 at 86. On April 19, 2025, Sturgis was seen for this sick call slip and orders for lead levels to be drawn were received from Hoover as requested by Sturgis. *Id*. at 615.

On April 28, 2025, Sturgis was seen for a sick call slip for persistent pain in his legs, but when he was seen, he complained of left upper chest pain with a lump in the same area. *Id*. at 611-12. Hoover ordered an ultrasound of the left breast.[4] *Id*. at 609-10. The following day, Sturgis submitted a sick call slip complaining of excruciating pain in his legs, with a feeling as though he was being "stabbed with pins & needles." *Id*. at 87.

On May 14, 2025, Sturgis was seen by Dr. Richard Schlottman who assessed Sturgis as having neuropathy. ECF No. 28-3 at 603-4. At this appointment, Sturgis was prescribed Naprosyn (Naproxen) 500 mg to be taken twice a day. *Id*. at 604.

On June 6, 2025, Sturgis submitted a sick call slip stating that Dr. Schlottman had prescribed Naproxen and Tegretol on May 14, 2025, but he never received the Tegretol. *Id*. at 92. He added that the Naproxen was not helping the pain in his legs despite the fact he was taking it as prescribed. *Id*. On June 12, 2025, Sturgis was offered an opportunity to be seen for this complaint, but he refused the sick call and also refused to sign an ROR form. *Id*. at 92, 93.

On June 15, 2025, Sturgis submitted another sick call slip stating that the Naproxen was not easing the pain in his legs. *Id*. at 94. He was seen for this complaint on June 19, 2025. *Id*. at 581-84. Nurse Practitioner Lucinda Everett noted that Sturgis's assessment included radiculopathy, lumbar region and neuropathy. *Id*. at 583. She wrote that she discussed options with Sturgis given his complaint that Naproxen was not addressing the pain in his legs, and that he had agreed to try a low dose of Nortriptyline 10 mg at bedtime. *Id*. Sturgis was to return in three months to see if the new medication was effective and a notation was made to have random blood level checks. *Id*.

On July 14, July 25, and August 6, 2025, Sturgis submitted sick call slips complaining that the medication he was given had no lasting effect on the pain in his legs. ECF No. 28-3 at 106-8.

---

[4] The ultrasound was performed on July 15, 2025, and revealed no abnormalities. ECF No. 28-3 at 113-14.

On July 16, 2025, Sturgis was seen by Morton for a sick call visit to address his complaint that the Nortriptyline was not helping his pain and that he had asked for muscle rub cream but had not been given any. *Id*. at 557-58. Morton noted that had been told previously to purchase muscle rub from the commissary because it had been confirmed that he was not indigent and had the ability to purchase it from the commissary. *Id*. at 558. She also noted that he had only been taking Nortriptyline for three weeks and was told to wait three months to determine if the medication would work. *Id*.

On August 11, 2025, a sick call slip was received from Sturgis stating he was unhappy with his current pain management plan. ECF No. 28-3 at 547. He requested to speak with the provider that prescribed Nortriptyline and Hoover wrote a referral for Sturgis to speak with the provider as he requested. *Id*.

On October 29, 2025, a sick call slip was received from Sturgis in which he stated that he was taken off of the medication for his nerve pain without being placed on a new medication for this issue. *Id*. at 103. Sturgis also wrote that he had been told two weeks prior that a nurse was going to refer him to a doctor, but he had not seen one yet. *Id*. A notation on the sick call slip indicates that Sturgis was seen on October 16, 2025, for this issue and was referred to a provider on that date. *Id*.

On October 30, 2025, Sturgis was seen for a "Provider Sick Call" to ask about a medication to replace what he was taking for nerve pain in his legs. ECF No. 28-3 at 509. After discussing options with Sturgis, Linda Everett, NP, prescribed Nortriptyline, 25 mg twice a day. *Id*. at 511.

On November 6, 2025, Sturgis was seen by Everett again for a scheduled provider visit for his chronic pain. ECF No. 28-3 at 506. Sturgis related that he had not seen much improvement in his pain since starting the Nortriptyline and complained that he had developed pain in his left shoulder and chest with tingling pain in his left hand. *Id*. In addition, he described symptoms of

muscle spasms and Everett suggested trying Robaxin (methocarbamol) in addition to the Nortriptyline. *Id*. 506, 508. Everett checked Sturgis for carpal tunnel syndrome with negative results and noted there were no increased symptoms at his elbow but that he complained of "acute pain in shoulder over the clavicle." *Id*. at 508. Sturgis told her that he had fallen from the top bunk and landed on his left arm. *Id*. Everett ordered an x-ray of Sturgis's left shoulder as a baseline and noted that further imaging and EMG studies may be needed if the symptoms did not resolve. *Id*.

On November 12, 2025, Sturgis submitted a sick call stating that he missed his scheduled x-ray because it had been scheduled at the same time he had a video visit. ECF No. 28-3 at 102. He asked if it could be rescheduled. *Id*. He also stated that his medication he was prescribed was not subduing his pain. *Id*. A notation written by Hoover on the sick call slip indicates that Sturgis would be seen by the Pain Committee the following day. *Id*.

On November 13, 2025, there was a Pain Committee Meeting convened regarding Sturgis. ECF No. 28-3 at 504-5. The committee was made up of the site Nurse Practitioner, site Medical Director, Health Services Administrator, Regional Director of Nursing, charge nurse, clinical pharmacist, and Assistant Commissioner of Operations and Management. *Id*. at 504. The pain committee discussed Sturgis's complaints of pain in his lower back, shoulders, and legs. *Id*. The committee then recommended the following treatment plan: (1) **Medication**: increase Nortriptyline to 75 mg daily; continue Robaxin 500 mg twice daily for 14 days and then discontinue as it is not intended for long term use; and Voltaren topical cream; (2) **Labs:** rheumatoid factor and urine drug screen; (3) **Sick Calls**: the RN will evaluate him on a biweekly basis for any sick calls received related to ongoing chronic back pain to ensure Sturgis is receiving his medications and taking them as prescribed. If there are any reports of acute changes in his back pain are received, Sturgis will be referred to the provider for further evaluation; (4) **Consults:** consider referral to neurology for nerve testing and possible epidural for continued pain despite treatment plan; (5) **Pain Committee Follow-**

**up**: follow up with committee in two months and schedule a follow-up appointment with on-site nurse practitioner to discuss Sturgis's request for ace wrap and compression sleeve . *Id*. at 504-5. Sturgis was brought to medical and the recommendations of the committee were discussed with him. *Id*. at 505. He declined Voltaren topical cream because it did not work in the past and declined physical therapy because "he is currently wrapping his right leg with an ace wrap and a compression sleeve." *Id*.

## STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The court may "consider documents attached to the complaint, *see* Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic[.]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citation omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56(a). A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for a court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; a court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261. Because Defendants filed their motion as a motion to dismiss, or in the alternative, for summary judgment, Sturgis was on notice that the Court could treat the motion as one for summary judgment and rule on that basis. Accordingly, Defendants' motion is construed as one seeking summary judgment.

Because Sturgis is self-represented, all of his pleadings are “liberally construed” and “held to less stringent standards than [those filed] by lawyers.” *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). “However, liberal construction does not absolve Plaintiff from pleading a plausible claim.” *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 314 (D. Md. 2014), aff'd, 584 F. App'x 135 (4th Cir. 2014); *see also Coulibaly v. J.P. Morgan Chase Bank, N.A.*, No. DKC-10-3517, 2011 WL 3476994, at *6 (D. Md. Aug. 8, 2011) (“[E]ven when pro se litigants are involved, the court cannot ignore a clear failure to allege facts that support a viable claim.”), aff'd 526 F. App'x 255 (4th Cir. 2013).

Moreover, a federal court may not act as an advocate for a self-represented litigant. *See Brock v. Carroll*, 107 F.3d 241, 242-43 (4th Cir. 1996); *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990). Therefore, the court cannot “conjure up questions never squarely presented,” or fashion claims for a plaintiff because she is self-represented. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985); *see also Maryland v. Sch. Bd.*, 560 F. App'x 199, 203 n.4 (4th Cir. 2014) (unpublished) (rejecting self-represented plaintiff's argument that district court erred in failing to consider an Equal Protection claim, because plaintiff failed to allege it in the complaint).

## ANALYSIS

### A. Corporate Responsibility

Sturgis has named Centurion as a Defendant but does not assert any particular corporate policy or practice that has resulted in the violation of his constitutional rights. In the case of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court held that local governmental entities may be liable under § 1983 based on the unconstitutional actions of individual defendants where those defendants were executing an official policy or custom of the local government that violated the plaintiff’s rights. *Id.* at 690-91. The *Monell* Court explained that “when execution of a government’s policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane*, 355 F.3d at 782.

Of import here, *Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 49 (1988); *Polk Cnty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999). Thus, those standards applicable to municipalities apply with full force to Centurion. *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability "'apply equally to a private corporation'" acting under color of state law) (citation omitted).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665-683, 98 S. Ct. 2018). They are not vicariously liable under § 1983 for their employees' actions. *See id*., at 691, 98 S. Ct. 2018; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 [] (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Indeed, "[i]t is well established that in a § 1983 case a city or

other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, 585 U.S. 87, 95 (2018) (citation omitted); *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (stating that liability attaches "only where the municipality *itself* causes the constitutional violation at issue") (emphasis in original). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Davison*, 912 F.3d at 689.

A plaintiff may demonstrate the existence of an official policy in three ways: (1) an express policy; (2) certain affirmative decisions of policymaking officials; and (3) a widespread practice that is so engrained it constitutes a custom, including omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Brown*, 520 U.S. at 403-04. Here, Sturgis simply includes Centurion in the caption of his complaint and does not include any specific allegations against the corporation; therefore, the complaint against Centurion will be dismissed.

**B. Eighth Amendment Claim**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501

U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543. Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko v. Shreve*, 535 F.3d 225, 241(4th Cir. 2008)); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994). Under this standard, Defendants "must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual

knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

Defendants do not appear to dispute that Sturgis suffers from chronic pain in his legs and lower back; the medical records submitted contain numerous notations acknowledging his complaints, medications provided, walking aids given to him, and the tests performed in an effort to determine the cause. *See generally* ECF No. 28-3. Assuming that Sturgis's chronic pain amounts to an objectively serious medical need, *see e.g., Jackson*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary), there is no evidence that these Defendants exhibited a callous disregard for that need. Defendant Hoover has been instrumental in securing x-rays, CT scans, and an MRI in an effort to determine what is causing Sturgis's pain. Additionally, she has ordered blood tests for lead content when he expressed concern about the bullet fragments left inside of his body possibly poisoning him. While Sturgis claims that Defendant Coleman has not taken his medical concerns seriously, there is no evidence to support that assertion. Rather, the uncontroverted evidence demonstrates that the entire medical team has taken the matter of Sturgis's unexplained, chronic pain very seriously and has worked tirelessly in search of both an answer and a pharmaceutical regimen that will alleviate his pain. Summary judgment will therefore be granted as to the individual defendants.

As noted above, to the extent that Sturgis has evidence to the contrary, he may file his substantive opposition within 28 days of the day of this opinion and this Court will reconsider its ruling in light of his filing.

**CONCLUSION**

By separate Order which follows, Sturgis's Motion for Extension of Time, ECF No. 32, will be granted *nunc pro tunc.* Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, shall be granted, subject to reconsideration should Sturgis file an opposition response within 28 days of the date of this opinion. This case will be closed, subject to reopening should reconsideration be warranted.

August 21, 2026
Date

/s/
Stephanie A. Gallagher
United States District Judge